UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DYNAMIC AIR, INC.,

    Plaintiff,

    v.                                       Case No. 05-C-910

DOWNEY, INC.,

    Defendant.

**DECISION AND ORDER ON MOTION FOR SUMMARY JUDGMENT**

## I. PROCEDURAL AND FACTUAL BACKGROUND

The plaintiff, Dynamic Air, Inc. ("Dynamic") commenced this action by filing a complaint alleging that the defendant, Downey, Inc. ("Downey"), breached its contract with Dynamic. The complaint also contains a count alleging unjust enrichment and a count seeking a declaratory judgment. Dynamic invoked this court's diversity jurisdiction pursuant to 28 U.S.C. § 1332 because Dynamic is a Minnesota corporation with its principal place of business in Minnesota, Downey is a Wisconsin corporation with its principal place of business in Wisconsin, and the amount in controversy exceeds $75,000.

In 2002 Downey was hired by the Milwaukee Metropolitan Sewerage District ("MMSD") as the general contractor for an expansion of the Jones Island Wastewater Treatment Plant ("the project"). Downey requested a bid from Dynamic for a pneumatic conveying system ("the system") as part of the project. Dynamic submitted a bid to provide the system which was accepted by

Downey. The exact provisions of the contract between Dynamic and Downey is a matter of dispute, but the parties do not dispute that a valid contract was formed.

The system was eventually satisfactorily installed at the Jones Island Plant, but not before encountering some bumps in the road. In Downey's view, Dynamic failed to live up to its contractual obligations, entitling Downey to set off the amount owed on the contract with "back charges," that is, expenses resulting from Dynamic's alleged failings. To date, $143,231 remains outstanding on the nearly one million dollar contract between Dynamic and Downey. Dynamic contends that it is due that entire amount. Downey contends that it owes Dynamic nothing. Downey has counterclaimed against Dynamic for amounts in excess of $130,000, consisting of expenses allegedly incurred because of Dynamic's failure to fulfill its obligations. Downey also maintains that it is entitled to attorney's fees based on the contract.

Dynamic has filed a motion for summary judgment. According to Dynamic, the terms of the warranty in the contract limit Downey to seeking replacement of any non-conforming parts, and explicitly bar any recovery for consequential damages. Therefore, Dynamic argues, the clear language of the contract bars Downey from applying any "back charges" to the amounts owed, and Dynamic is entitled to the full contract price as a matter of law. In the alternative, Dynamic argues that it is entitled to partial summary judgment in the amount of $53,753, an amount representing the difference between the amount of the contract price owing and the amount of "back charges" that Downey itemized in a letter to Dynamic dated June 30, 2006. Downey contests Dynamic's claim that it is precluded from seeking consequential damages by the contract and maintains that summary judgment is inappropriate because there remain issues of material fact. Dynamic's motion for summary judgment is now fully briefed and is ready for resolution.

In accordance with the local rules, Dynamic filed a set of Proposed Findings of Fact along with its motion for summary judgment. Downey responded to such proposed findings of fact and objected to a number of them. The following is a summary of the disputed and undisputed facts in this matter. Unless otherwise noted, the facts are undisputed.

Dynamic Air is a Minnesota company engaged in the business of selling pneumatic conveying equipment and systems which use pressurized air or other gases to move materials in closed pipeline systems in a wide variety of industrial settings. (Pl.'s Proposed Findings of Fact ("PPFOF") at ¶ 1.)

In July, 2002, MMSD began the Jones Island project on which Downey served as the prime contractor. In October, 2002, Dynamic submitted its proposal to supply the plant's pneumatic conveying system for conveying dried sludge. Dynamic's bid was based on the project specifications for the pneumatic conveying system together with bid drawings showing the existing plant layout. Dynamic's proposal was also subject to its Standard Terms and Conditions. (PPFOF at ¶¶ 2-3.) Dynamic contends that the project specifications were "supplied by MMSD and Downey." (PPFOF at ¶ 3). Downey maintains that it had nothing to do with the design of the project or with the authoring of the specifications. Downey contends that Dynamic in fact consulted with "the owner and with the project engineer respecting the design of The System" (Def.'s Resp. to PPFOF at ¶ 1.)

On February 6, 2003, Downey accepted Dynamic's proposal by issuing Downey Purchase Order No. 1089-2501MS which included terms that varied from Dynamic's standard Terms and Conditions. To resolve these differences, the parties negotiated a mutually-agreeable set of Additions &/or Modifications to Purchase Order and (Downey's) General Terms and Conditions which were made a part of the parties' contract as of April 3, 2003. The agreed-upon revisions, separately listed

3

as "Item #__", refer back and correspond to the numbered paragraphs in the Downey Purchase Order General Terms and Conditions. (PPFOF at ¶ 5.)

Dynamic asserts that its proposed routing of the system piping was based on the bid drawings supplied by Downey and MMSD. On March 31, 2003, Dynamic's drawings (referred to as "shop drawings") were approved by Downey's project manager with the statement that, "[W]e [Downey] hereby certify that equipment complies with all requirements of plans and specifications and have been checked for performance, space requirements, access, etc." (PPFOF at ¶ 5.) In response to these factual assertions, Downey again maintains that while it did not participate in preparing the plans for the project, Dynamic itself consulted with the owner and project engineer regarding the design of the system. Furthermore, Downey asserts that while Dynamic's "shop drawings" may have been initially accepted, acceptance was later withdrawn to the extent that a "recommendation" in the shop drawings was expressly rejected by MMSD. (Def.'s Resp. to PPFOF at ¶ 2.)

Dynamic claims that its only role in the project was that of an "equipment supplier" of the pneumatic conveying system, "not an on site contractor." Dynamic maintains that it was not responsible for any site preparation, assembly or installation of the equipment, particularly the "Piping System," which remained the sole responsibility of Downey and its construction site subcontractors. (PPFOF at ¶ 6.) Downey disputes this claim by Dynamic, asserting that Dynamic's own bid expressly included some on-site labor, including installation supervision service and start-up service. (Def.'s Resp. to PPFOF at ¶3.)

The project called for the use of ceramic lined pipe and bends to maximize resistance to the abrasive quality of the sludge material and also to minimize the regular maintenance and replacement of pipe segments in inaccessible locations. Ceramic lined components are made by joining together

4

standard ceramic donuts and centering them in standard, larger diameter carbon steel pipe. The gap between the ceramic donuts and the inner circumference of the pipe wall is then filled with concrete, resulting in a very robust, heavy component which should require minimal maintenance and repair. Because of its greater diameter and hardness, however, ceramic lined components are also more difficult to size and cut at the construction site than standard steel components. (PPFOF at ¶¶ 10-11.)

Between May and July, 2003, Dynamic repeatedly inquired of Downey how it wished to address the issue of final sizing and assembly of the ceramic lined components at the project construction site. Dynamic presented two options: (A) Downey could measure and cut the ceramic lined pipe at the construction site; or (B) Downey could measure the necessary length of any final pieces to complete any section of piping, which Dynamic would then fabricate to Downey's specification of field measurements and promptly deliver to the construction site. (PPFOF at ¶ 12.) Downey does not contest that Dynamic presented these two options, but maintains that the issue of final sizing was not an installation issue, but a manufacturing issue within Dynamic's contractual obligations. (Def.'s Resp. to PPFOF at ¶ 5.)

Dynamic claims that Downey did not elect either of Dynamic's proposed options. Instead, Downey asked for MMSD's approval to install temporary steel pipe segments, known as "spool pieces," which would then be subsequently replaced with permanent ceramic lined segments fabricated and delivered to the construction site based on Downey's field measurements. (PPFOF at ¶ 13.) Downey contends that it was Dynamic, and not Downey, that suggested the use of temporary piping, and that Downey requested approval from MMSD to use temporary piping at Dynamic's behest. (Def.'s Resp to PPFOF at ¶ 6.)

5

Dynamic maintains that on July 9, 2003, Downey obtained a Contract Clarification/Interpretation from MMSD formally approving a construction methodology utilizing temporary piping. Furthermore, Dynamic alleges that Downey never claimed that this approach was in any way contrary to Dynamic's Proposal, was a breach of the parties' contract, or would otherwise expose Dynamic to any subsequent claims for damages and back charges. (PPFOF at ¶ 14.) Downey sees things differently. Downey contends that it sought the contract clarification/interpretation at Dynamic's behest, and did in fact inform Dynamic that this approach was inconsistent with Dynamic's proposal and that Downey would be seeking to recover resulting costs from Dynamic. (Def.'s Resp. to PPFOF at ¶ 7.)

As the Project approached completion and Dynamic demanded payment of ever increasing past due invoices, Downey began making claims for set-offs and back charges as well as claiming the right to withhold "retainages." In order to induce Dynamic's continued work and performance, Downey also made repeated promises of payment which it later repudiated. (PPFOF at ¶ 15.) The parties dispute whether Downey was entitled to withhold payment under the contract.

The system was completed and accepted as of April 12, 2005, and is currently running without problem. The amount still outstanding on the contract is $143,231.00. (PPFOF at ¶ 16-17.)

Once the system was installed and fully operational, Dynamic received a series of communications claiming various back charges from Downey's Vice President, Mr. John P. VanderBloemen ("VanderBloemen"). VanderBloemen is a CPA and was the Downey officer responsible for communicating about these matters and documenting Downey's claimed back charges against Dynamic. VanderBloemen's initial letter of April 26, 2005, claimed back charges of $87,528.52, and was accompanied by an itemized schedule of charges. Downey's own schedule

6

reflects a "Balance due" of $54,134.48, and the corresponding cover letter states that the claimed back charges will be deducted from Dynamic's "final payment." VanderBloemen's next letter dated May 9, 2005, revised the claimed back charges to $86,489.06. In response to Dynamic's direct request for a final figure of all claimed back charges, on June 30, 2005, VanderBloemen sent a letter with attached schedules and other documentation claiming back charges of $89,477.35, leaving a contract balance of $53,753.65. Upon commencement of this action, Downey asserted a Counterclaim for the first time claiming back charges and related damages "in an amount of over $130,000." (PPFOF at ¶¶ 19-22.) Downey does not contest that VanderBloemen sent the letters, but maintains that VanderBloemen's correspondence erroneously neglected to include all of the costs associated with the use of temporary pipe. (Def.'s Resp. to PPFOF at ¶ 10.)

Dynamic claims that despite repeated discovery demands, Downey has never provided any information or documentation substantiating or otherwise supporting the increased back charges set forth in its Counterclaim. (PPFOF at ¶ 25.) Downey claims that is has tendered documentation substantiating its increased back charges to Dynamic. (Def.'s Resp. to PPFOF at ¶ 12.)

## II. SUMMARY JUDGMENT

A district court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting advisory committee's note to 1963 amendment of Fed. R. Civ.

P. 56(e)). "Summary Judgment is not appropriate 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party'" *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party opposing a properly supported summary judgment motion "may not rest upon the mere allegations or denials of the adverse party's pleading" but rather must introduce affidavits or other evidence to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001). To state it differently, "[a] party will be successful in opposing summary judgment only when they present definite, competent evidence to rebut the motion." *EEOC v. Sears, Roebuck & Co.,* 233 F.3d 432, 437 (7th Cir. 2000) (quoting *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997)).

To determine whether genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (quoting *Anderson,* 477 U.S. at 255). "'In the light most favorable' simply means that summary judgment is not appropriate if the court must make 'a choice of inferences.'" *Draghi v. County of Cook*, 184 F.3d 689, 691 (7th Cir. 1999) (quoting *Smith*, 129 F.3d at 425). "The evidence must create more than 'some metaphysical doubt as to the material facts.'" *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001) (quoting *Johnson v. University of Wisconsin-Eau Claire*, 70 F.3d 469, 477 (7th Cir.

1995)). A mere scintilla of evidence in support of the nonmovant's position is insufficient. *Id.* (citing *Anderson*, 477 U.S. at 252). Put another way, "a litigant is entitled to summary judgment if, should the case go to trial on the record compiled in the summary judgment proceedings, he would be entitled to judgment as a matter of law." *Walker v. Abbott Laboratories*, 416 F.3d 641, 645 (7th Cir. 2005).

Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

### III. DISCUSSION

Dynamic's motion for summary judgment presents two questions to the court. The first is a question of contract construction: does the contract bar Downey from seeking consequential damages in the case of a breach by Dynamic? The second question is, even if Downey can seek consequential damages for a breach, and assuming a breach on the part of Dynamic, is there a portion of the outstanding balance on the contract over which there is no material question of fact that Dynamic is owed? The parties seem to be in agreement that Wisconsin law governs the resolution of these questions.

**A. The Contract**

"Absent ambiguity within the document, the construction of a contract presents a question of law." *Koenings v. Joseph Schlitz Brewing Co.*, 126 Wis. 2d 349, 366, 377 N.W.2d 593, 602 (Wis. 1985). In the case of an unambiguous contract, "'the office of judicial construction is . . . to determine what the parties contracted to do; not necessarily what they intended to agree to, but what,

9

in a legal sense, they did agree to, as evidenced by the language they saw fit to use.'" *Id*. (quoting *Miller v. Miller*, 67 Wis. 2d 435, 442, 227 N.W.2d 626 (Wis. 1975)). "The general rule as to construction of contracts is that the meaning of particular provisions in the contract is to be ascertained with reference to the contract as a whole." *Tempelis v. Aetna Cas. & Sur. Co.*, 169 Wis. 2d 1, 9, 485 N.W.2d 217, 220 (Wis. 1992). Moreover, "[c]ontract terms being construed should be considered in context." *Wausau Joint Venture v. Redevelopment Auth.*, 118 Wis. 2d 50, 58, 347 N.W.2d 604, 608 (Wis. Ct. App. 1984). "Contracts must be read in such a manner as to give a reasonable meaning to each provision and without rendering any portion superfluous." *DeWitt Ross & Stevens, S.C. v. Galaxy Gaming & Racing Ltd. P'ship.*, 273 Wis. 2d 577, 597, 682 N.W.2d 839, 849 (Wis. 2004).

If, however, the contract is ambiguous, the parties' intent becomes an issue of fact. "Construction of a contract is essentially one of determining the intent of the parties. It is normally a matter of law for the court. If the contract is ambiguous, the question of intent is one for the trier of fact." *Armstrong v. Colletti*, 88 Wis. 2d 148, 153, 276 N.W.2d 364, 366 (Wis. Ct. App. 1979).

The contract between Dynamic and Downey took the form of several documents. First, there is Dynamic's proposal which includes a two-page document entitled "Proposal Terms and Conditions." (Taylor Aff., Exs. A and B.) Next, there is Downey's purchase order which was made in response to Dynamic's proposal. The purchase order has a three-page attachment entitled "Purchase Order General Terms And Conditions." (Taylor Aff., Ex. C.) Finally, there is a document entitled "Additions &/or Modifications to Purchase Order and General Terms and Conditions" which is signed by a representative of both Dynamic and Downey. (Taylor Aff. Ex. D.) I will refer to the

10

various documents as the "Proposal," "Proposal Terms," "Purchase Order," "Purchase Order Terms," and "Modifications," respectively.

The parties did not dedicate much space in their briefs to arguing which documents actually became part of the contract. It appears that Downey's position is that the Proposal Terms were not part of the final contract (Def.'s Br. at 4.) However, it is not clear that Dynamic would agree to this. In any event, the parties agree that the Proposal, the Purchase Order Terms, and the Modifications (to the extent that each was not modified by a subsequent document) became part of the contract. With this in mind, I turn to Dynamic's claim that the contract bars Downey from seeking any consequential damages in the case of a breach by Dynamic.

Dynamic's Proposal includes a section entitled "Clarifications to the Specifications." That section references specific sections of the project specifications. The clarification to specification "14800 - page 13" states, in pertinent part:

> (PERFORMANCE WARRANTY) For a period of five (5) years from the date of shipment, Dynamic Air warrants that the system sold by Dynamic Air will perform and function within the specifications, conditions and limitations published by Dynamic Air in its proposal.
>
> Dynamic Air's liability under this Warranty is expressly limited to correction within a reasonable time, using Dynamic Air's best efforts, of any defects or errors, which in the judgment of Dynamic Air were made by it in the design of the system, and to the repair or replacement of any parts of the system which are defective in material or workmanship by making available FOB Dynamic Air's plant a repaired or replacement part, provided such defective parts are returned to Dynamic Air at Buyer's expense.
>
> . . . .
>
> Dynamic Air shall not be liable for any special, indirect or consequential damages. The remedies set forth herein are exclusive, and the liability of Dynamic Air with respect to the system or any act or omission in connection therewith, whether in a contract, tort, or under any warranty or otherwise, shall not, under any circumstances, exceed the actual price of the system paid to Dynamic Air . . . .

11

This warranty is in lieu of all warranties of merchantability, fitness for a particular purpose or other warranties, express or implied, including that against patent infringement but excepting that of title. The implied warranties of merchantability and fitness for a particular purpose are hereby disclaimed. Correction of non-conformities in the manner and for the period of time provided above shall constitute fulfillment of all liabilities of Dynamic Air to Buyer, whether based on contract, negligence or other wise, with respect to the system.

The Warranty provided herein shall apply only if the system is installed and operated according to all specification, drawings, operating manuals and other conditions published by Dynamic Air, has been subjected to normal use for the purpose for which the system was proposed and designed, has not been subjected to misuse, negligence, or accident, Dynamic Air's start-up services were used, and the system has not been altered or repaired in any respect without the written approval of Dynamic Air.

Buyer bears sole liability for all defects, errors, or problems associated with, caused by, or resulting from any component(s), part(s), or installation work not provided by Dynamic Air.

Next is the Purchase Order Terms. That document contains a number of pertinent provisions that are modified by the Modifications. Items #10 and #29 of the Purchase Order Provisions provide:

10. All material and equipment furnished under this order shall be guaranteed by the Seller against defects, and Seller agrees to replace without charge to Buyer said material and equipment, or remedy and [sic] defects, latent or patent, not due to ordinary wear and tear, or not due to improper use or maintenance, which defects may develop within one year from the date of acceptance by Owner, or within the guarantee period set forth in applicable plans and specifications, whichever period is longer.

. . . .

29. Seller warrants that the material and equipment delivered under this Purchase Order is suitable for the purpose intended and Seller guarantees that said materials and equipment will produce capacities and meet design specifications and function: (1) as called-for in the plans, specifications and addenda; and (2) as here in set forth; and (3) as published or warranted by the manufacturer for the equipment involved. In the event the equipment does not meet the foregoing requirements, Seller shall immediately on written notice from Buyer, replace the same, or remedy the deficiency, without expense to Buyer, and Seller shall indemnify and hold Buyer

12

harmless from any damages resulting from the breach of said warranties and guarantees.

Items #10 and #29 are addressed and amended by the Modifications as follows:

The warranty shall be as provided for in the General Conditions of the Contract between Downey and the MMSD, except where superseded or added to by the warranty provisions stated in the Dynamic Air proposal. Therefore, contrary to the General Conditions, Dynamic Air's liability under this warranty excludes the costs associated with the actual field work to remove and re-install any equipment that is provided as a replacement item under the warranty. Further, all hold harmless provisions of the General Conditions shall only apply to Dynamic Air to the extent of Dynamic Air's scope in the project.

Next, item #20 of the Purchase Order Terms states, "[r]ejected material shall be returned at Seller's

expense." The Modifications modify item #20 as follows:

Seller's liability under this Warranty is expressly limited to correction within a reasonable time, using Seller's best efforts, of any defects or errors, which in the judgment of Seller were made by it in the design of the system, and to the repair of replacement of any parts of the system which are defective in material or workmanship by making available FOB Seller's plant a repaired or replacement part, provided such defective parts are returned to Seller at Buyer's expense.

Items #21 and #34 of the Purchase Order Terms provide that:

21. In the event of default of any of the terms and conditions set forth herein, Seller agrees to pay all of the Buyer's costs resulting there from, including, but not limited to, reasonable attorney's fees incurred by Buyer in enforcing the Purchase Order.

   . . . .

34. The Seller hereby agrees to indemnify and save harmless the Buyer from and against all claims, liability, loss, damage, or expense including attorney's fees, by reason of any actual or alleged infringement of letters patent, or of any litigation based thereon covering [sic] by items purchased hereunder.

Items #21 and #34 are modified by the Modifications as follows:

Seller shall be responsible for only the liabilities that relate to the negligence of the Seller and the Buyer shall be responsible for the liabilities related to Buyer's respective negligence.

13

I have excerpted rather extensively from the pertinent documents so as to present the provisions of the contract in context. When looked at in context, it is clear that the limitation on consequential damages on which Dynamic relies is itself limited. The contract provisions make it clear that in the case of a defect or failure of a part of the system, Downey's only remedy is replacement or repair of the problem part. In such a case, Downey cannot seek consequential damages or other remedies. Dynamic argues that the contract bars Downey from seeking consequential damages entirely, not just in the case of a failure or defect in the system. The plain language of the contract does not support Dynamic's contention.

First of all, Dynamic's disavowal of liability for consequential damages and the accompanying limitation of seeking the remedy of repair or replacement, which is set forth in the Proposal, is made in the context of a performance warranty. The entire portion of the Proposal excerpted above falls under a heading which makes it clear that the limitations refer to the performance warranty. The performance warranty warrants that the system will function as it is supposed to "[f]or a period of five (5) years from the date of shipment." The proposal then goes on to specify that the remedy for a breach of the performance warranty is limited to repair or replacement, and that consequential damages and all other warranties are disavowed.

Moreover, the Proposal makes clear that the warranty is only valid if the system is installed according to Dynamic's specifications. This lends further support for the conclusion that the warranty, and hence the limitations on damages associated with the warranty, are not all-encompassing. The warranty and its limitations apply to problems with the system that manifest themselves <u>after</u> the system is installed, not problems having to do with timely manufacturing of parts.

14

The provisions in the Purchase Order Terms, as modified by the Modifications, limit Downey in a similar way. In the provisions excerpted above, where Downey's potential remedies are limited, the limitation is in the context of the system failing to perform at proper capacities, or a part being defective, or having to be replaced. Furthermore, Item #21 of the Purchase Order Terms provides that "[i]n the even of default of any of the terms and conditions set forth herein, Seller agrees to pay all of the Buyer's costs resulting there from, including, but not limited to, reasonable attorney's fees incurred by Buyer in enforcing the Purchase Order." The Modifications then provide that "Seller shall be responsible for only the liabilities that relate to the negligence of the Seller and the Buyer shall be responsible for the liabilities related to Buyer's respective negligence." Simply stated, acknowledging that the seller, i.e., Dynamic, is responsible for "liabilities that relate to the negligence of the Seller" does not comport with a complete disavowal of all remedies, other than repair and replacement, in all circumstances.

All this having been said, Downey's counterclaim is not based on a failure or defect in any part of the system. Instead, Downey's counterclaim, and its basis for assessing "back charges" to the amounts it owed Dynamic, is based on Dynamic allegedly failing to deliver the system at the time and in the manner that was required by the contract. Downey claims that Dynamic failed to deliver (or made clear that it could not deliver) the necessary pieces of ceramic lined pipe according to the established time schedule. According to Downey, that in turn necessitated seeking approval for, and using, temporary pieces of steel pipe while Dynamic continued to work on producing the ceramic lined pipe. Downey seeks consequential damages that resulted from this delay and additional work, not from any failure of the system.

15

Simply stated, the bar on seeking consequential damages contained in the contract does not apply to alleged breaches having nothing to do with the system's performance. Under Dynamic's preferred reading of the contract, no matter how much it delayed in supplying the equipment it was under contract to supply, and no matter how much this set Downey back, Downey would have no recourse. As long as Dynamic eventually delivered the system in working order, Downey could not seek any damages. Not only does it seem unlikely that Downey would agree to such an arrangement, but for the reasons discussed above, the plain language of the contract does not suggests that it did.

In sum, I find that the contract is plain and unambiguous in so far as defining the circumstances under which Downey is barred from seeking consequential damages and the circumstances under which it is limited to seeking only the remedy of repair or replacement. Such limitations are only applicable to product failures or defects. They are not applicable to other breaches of contract, such as completely failing to deliver products, or failing to deliver products in a timely manner.

Having determined that Downey is not barred from seeking consequential damages under all circumstances, the focus then turns to whether Dynamic breached its contract with Downey, thus justifying Downey in withholding certain amounts due under the contract. Downey alleges that Dynamic did not deliver all of the ceramic lined pipe according to the established time schedule, and that this resulted in expenses to Downey. The question is, was that failure a breach of contract? In this regard, the contract is ambiguous. To be sure, Dynamic's primary responsibility under the contract was to deliver the pneumatic conveying system. However, this was not a simple matter of loading a pre-existing system onto a truck and delivering it. The system had to be custom-made for

16

its intended purpose. This in turn involved the manufacturing of sections of ceramic lined pipe of precise dimensions.

The parties' submissions to the court reveal that there was more to the manufacturing of these pipes than simply referring to a set of pre-existing measurements. This much is evidenced by Dynamic's various proposals to Downey as to how to go about making final measurements needed to manufacture the pipe, and the eventual need to use temporary pipe. What is not clear from the contract is who bore exactly what responsibilities in this regard. Dynamic claims that it was merely an "equipment supplier" and not an on-site contractor. Indeed, the Modifications make that much explicit. (Taylor Aff., Ex. D at 2.) Moreover, it is clear that Downey was responsible for installing the system. Dynamic's Proposal provides that "[t]he proposed price does not include installation of any proposed equipment. Responsibility for installation work is solely that of the contractor." (Taylor Aff., Ex. A at 6.)

However, the contract is not clear on its face as to who was supposed to do what to make sure that everything went together properly. Was it permissible for Dynamic to send pipe a little too long with the expectation that Downey would cut it to size as part of the "installation" process? Was Dynamic required to go to the site and take the measurements it needed so as to provide the exact equipment it was under contract to provide? Should Downey have provided Dynamic with exacting measurements at an earlier date, and having failed to do so, did Downey effectively prevent Dynamic from performing? None of these questions are answered by the face of the contract.

Dynamic asserts that the fact that Downey sought and obtained a "contract clarification/interpretation" from MMSD allowing the use of temporary piping establishes conclusively that using temporary pipe "was permissible and in accordance with the Project's

contract documents." (Pl.'s Reply at 4-5.) In other words, Dynamic claims that the "contract clarification/interpretation" conclusively establishes that it did not breach the contract. However, at this point in the proceedings I am obliged to construe all facts in the light most favorable to Downey. It is possible that when faced with Dynamic's inability to deliver the ceramic lined piping on time, Downey simply did what was necessary to minimize resulting expenses. I cannot say that the fact that Downey sought the "contract clarification/interpretation" necessarily means that Dynamic was not already in breach of the contract when it did so. That determination will be for the trier of fact.

In the end, the determination of who bore what responsibilities with regard to the details surrounding the need to use temporary pipe, and ultimately, whether Dynamic breached the contract, are issues that cannot be resolved on this current motion for summary judgment.

## B. The Amount of Consequential Damages Actually in Dispute

Dynamic next argues that even if it can be held liable for consequential damages, and even if it did fail to live up to its obligations under the contract, summary judgment is still warranted as to the sum of $53,753. This amount reflects the difference between the total amount outstanding on the contract ($143,231), and the amount of expenses that in correspondence delivered to Dynamic previous to this litigation Downey claimed were incurred as a result of having to use temporary pipe ($89,477.35).

To be sure, in a letter dated June 30, 2005, John VanderBloemen provided Dynamic with an itemized account of the "revised back charges" Downey was applying to the outstanding balance on the contract. According to the letter, that amount was $89,477.35. However, Downey maintains that upon commencement of this suit, it did a comprehensive review of the expenses incurred as a result of Dynamic's alleged failings under the contract. Downey now claims that Dynamic's alleged breach
18

cost it $135,633. Moreover, Downey claims that under the contract, Dynamic is liable for Downey's attorney's fees. (Def.'s Br. at 21.)

In support of this claim, Downey has provided the affidavit, made on personal knowledge, of Greg Coffman ("Coffman"), the president of Downey. Coffman asserts that "Mr. VanderBloemen did not include all of the costs associated with the use of temporary pieces in his correspondence to Dynamic." (Coffman Aff. at ¶ 32.) According to Coffman, VanderBloemen failed to include certain costs associated with field measurement, fabrication, and installation of the temporary pipe. Moreover, Coffman asserts that the $135,633 figure is supported by time sheets and other documents that were included as exhibits to his affidavit.

In short, Downey has provided competent evidence, in the form of Coffman's affidavit and supporting documents, to rebut Dynamic's claim that $53,753 is not in dispute. The determination of what damages Downey suffered because of Dynamic's alleged breach (if indeed it is determined that there was a breach) is for the trier of fact.

In conclusion, and for all of the foregoing reasons, Dynamic's motion for summary judgment will be denied.

**NOW THEREFORE IT IS ORDERED** that the plaintiff's motion for summary judgment be and hereby is **DENIED**;

**IT IS FURTHER ORDERED** that on Friday, August 18, at 9:30 a.m. a further scheduling conference will be conducted in Room 253 of the United States Court House, 517 E. Wisconsin Ave., Milwaukee, Wisconsin, to discuss with the parties the steps necessary to further process this case.

**SO ORDERED** this 7th day of August 2006, at Milwaukee, Wisconsin.

                                        /s/ William E. Callahan, Jr.
                                        WILLIAM E. CALLAHAN, JR.
                                        United States Magistrate Judge